UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

E-IMAGEDATA CORP.,

    Plaintiff,

  v.              Case No. 2:15-cv-00658-LA

DIGITAL CHECK CORP.
d/b/a ST Imaging,

    Defendant.

## E-IMAGEDATA CORP.'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT ........................................................ 1

UNDISPUTED FACTS ......................................................................... 2

    I.    ST IMAGING AND E-IMAGE ARE COMPETITORS THAT SELL SIMILAR PRODUCTS TO A FINITE CUSTOMER BASE .............................. 2

    II.    E-IMAGE AND ST IMAGING'S PRODUCTS .................................... 2

    III.    ST IMAGING USES LITERALLY FALSE STATEMENTS TO UNFAIRLY COMPETE ........................................................................ 3

        A.    ST Imaging Misrepresented The Optical Magnification Of Its ViewScans .......................................................... 3

        B.    ST Imaging Misrepresented The Megapixel Capabilities Of Its ViewScans ............................................................. 6

        C.    ST Imaging Misrepresented the Safety Certifications Of Its ViewScans .......................................................... 7

        D.    ST Imaging has made unsubstantiated product claims ........................... 8

    IV.    ST IMAGING MADE FALSE STATEMENTS TO CUSTOMERS IN ADVERTISEMENTS AND MARKETING MATERIALS USED ACROSS THE COUNTRY ................................................................... 9

ARGUMENT ...................................................................................... 10

    I.    E-IMAGE IS ENTITLED TO SUMMARY JUDGMENT THAT ST IMAGING VIOLATED THE LANHAM ACT ........................... 10

        A.    Summary judgment is appropriate when literal false statements are made ................................................. 10

        B.    When Evaluated In Context, ST Imaging's Statements Are Held Out As Fact Based .......................................... 12

        C.    The Undisputed Record Proves ST Imaging's Statements Are Literally False ...................................................... 12

            1.    ST Imaging's statements are implied establishment claims that ST Imaging lacks testing to substantiate ............................... 13

            2.    Undisputed evidence proves ST Imaging's statements are false ................................................................ 16

                (a)    ST Imaging's magnification claims are literally false ................................................ 17

                (b)    ST Imaging's camera claims are literally false ................ 18

                (c)    ST Imaging's Claims of UL Certification Were Literally False ............................................. 20

|   | D. | ST Imaging's False Statements Were In Commercial Advertising | 20 |
|---|---|---|---|
|   | E. | ST Imaging's False Statements Were In Interstate Commerce | 22 |
|   | F. | Consumer Deception, Materiality, and Injury Are Presumed | 22 |
| II. |   | ST IMAGING'S MISREPRESENTATIONS MISLED CUSTOMERS | 23 |
|   | A. | ST Imaging's Misrepresentations Deceived Customers | 23 |
|   | B. | e-Image Has Been Harmed By ST Imaging's False Advertising | 25 |
| III. |   | ST IMAGING'S FALSE ADVERTISING WAS WILLFUL | 26 |
|   | A. | ST Imaging Knew Its Statements About Optical Zoom Were False | 26 |
|   | B. | ST Imaging Knew Its Statements About Camera Megapixel Capabilities Were False | 28 |
|   | C. | ST Imaging Knew Its Statements About UL Certification Were False | 29 |
| CONCLUSION |   |   | 30 |

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ................................................................. 23

*Avila v. Rubin*,
   84 F.3d 222 (7th Cir. 1996) ................................................................. 23

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
   168 F.3d 967 (7th Cir. 1999) ........................................................ 10, 22

*BASF Corp. v. Old World Trading Co.*,
   41 F.3d 1081 (7th Cir. 1994) ............................................. 10, 12, 13, 14

*Doe v. Smith*,
   429 F.3d 706 (7th Cir. 2005) ............................................................... 22

*Dyson, Inc. v. Bissell Homecare, Inc.*,
   951 F. Supp. 2d 1009 (N.D. Ill. 2013) ................................................. 11

*ECOS Elecs. Corp. v. Underwriters Labs.*,
   743 F.2d 498 (7th Cir. 1984) ................................................................. 7

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*,
   96 F. Supp. 2d 824 (N.D. Ill. 2000) ..................................................... 21

*Fishman Transducers, Inc. v. Paul*,
   684 F.3d 187 (1st Cir. 2012) ................................................................ 26

*Genderm Corp. v. Biozone Labs.*,
   No. 92 C 2533, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992) .................. 15

*Generac Power Sys., Inc. v. Kohler Co.*,
   No. 12-C-66, 2013 WL 238843 (E.D. Wis. Jan. 22, 2013) .................... 25

*Grubbs v. Sheakley Grp., Inc.*,
   807 F.3d 785 (6th Cir. 2015) ............................................................... 22

*GSI Grp., Inc. v. Sukup Mfg. Co.*,
   No. 05-3011, 2008 WL 4826265 (C.D. Ill. Oct. 28, 2008) .................... 11

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
   191 F.3d 813 (7th Cir. 1999) ............................................................... 23

*ITEX Corp. v. Glob. Links Corp.*,
    90 F. Supp. 3d 1158 (D. Nev. 2015)..................................................................... 11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014)........................................................... 25

*Neuros Co. v. KTurbo, Inc.*,
    698 F.3d 514 (7th Cir. 2012) ............................................................................... 21

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ............................................................................... 16

*Rhone-Poulenc Rorer Pharm., Inc. v Marion Merrell Dow, Inc.*,
    93 F.3d 511 (8th Cir. 1996) ................................................................................. 16

*Riddell, Inc. v. Schutt Sports, Inc.*,
    724 F. Supp. 2d 963 (W.D. Wis. 2010) ................................................................ 11

*Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*,
    702 F. Supp. 2d 266 (D. Del. 2010)...................................................................... 13

*Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*,
    No. CIV.09-642-SLR, 2010 WL 1992247 (D. Del. May 18, 2010)........................ 11

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*,
    586 F.3d 500 (7th Cir. 2009) .......................................................................... 16, 23

*Schutt Mfg. Co. v. Riddell, Inc.*,
    673 F.2d 202 (7th Cir. 1982) ............................................................................... 24

*Scranton Gillette Commc'ns, Inc. Dannhausen*,
    No. 96 C 8353, 1999 WL 558134 (N.D. Ill. July 27, 1999)................................... 12

*Tao of Sys. Integration, Inc. v. Analytical Serv. & Materials, Inc.*,
    299 F. Supp. 2d 565 (E.D. Va. 2004) ................................................................... 22

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ................................................................................ 12

*UL LLC v. Space Chariot Inc.*,
    ___ F. Supp. 3d ___, 2017 WL 1423706 (C.D. Cal. April 20, 2017)...................... 14

*Underwriters Labs., Inc. v. Innovative Indus. of Tampa, Inc.*,
    No. 99 C 6485, 2000 WL 631304 (N.D. Ill. May 16, 2000) ......................... 7, 13, 14

**Statutes**

15 U.S.C. § 1117(a) ................................................................................................ 26

## SUMMARY OF THE ARGUMENT

This lawsuit involves false advertising in violation of the Lanham Act. e-Image and ST Imaging are the primary national competitors selling digital microform readers. For years, e-Image products performed well in the marketplace and e-Image increased its revenues annually. However, e-Image's revenues declined after ST Imaging began misrepresenting its own products' capabilities. e-Image filed this suit to stop ST Imaging from misrepresenting both its own products and e Image's products, and to recover damages for the revenues ST Imaging generated as a result of its misrepresentations. The amount at issue is millions of dollars in revenue.

The undisputed evidence establishes that ST Imaging made unsubstantiated product claims and literally false statements to consumers. Specifically, ST Imaging misrepresented: (1) the optical magnification of its products; (2) the resolution capabilities of its cameras; (3) that its products possessed specific safety certifications when they did not; and (4) that its product specifications were equivalent to e-Image's ScanPro product specifications.

Because microform readers are used to view images that have been photographically reduced for archival purposes, the optical magnification capability and camera system are critical features necessary to the products' basic function. Similarly, many customers require products they purchase to have safety certification by a nationally recognized testing laboratory. As a result, ST Imaging's statements regarding optical magnification, camera specifications, and safety certifications were material to purchasing decisions, misled consumers, and damaged e-Image.

Further, ST Imaging knew that its products did not conform to the optical magnification, camera resolution, or safety certifications represented in its marketing materials. When the misrepresentations were questioned internally by ST Imaging employees, ST Imaging ignored the problems and continued to make false representations to third party resellers and customers. Why? Because those misrepresentations were winning ST Imaging sales, and helped its bottom line.

Based on the record, the Court should grant partial summary judgment that ST Imaging's literally false statements violate the Lanham Act, and that ST Imaging's actions were willful.

## UNDISPUTED FACTS

### I. ST IMAGING AND E-IMAGE ARE COMPETITORS THAT SELL SIMILAR PRODUCTS TO A FINITE CUSTOMER BASE.

Microform readers allow users to view images contained in microforms, which include microfilm, microfiche, aperture cards, and ultrafiche. (SFF 12, 13.[1]) The readers project light through the microform onto an image sensor, which allows the system to create a digital image that can be viewed using a computer. Users can view, print, manipulate, e-mail, or save the image to a variety of digital media.

The market for microfilm readers is generally limited to a finite number of customers. (PMF 103[2].) Libraries, universities, museums, government offices, and private companies with archival microfilm are the primary purchasers of these scanners. (PMF 103.) As a result of the limited customer base, the number of microfilm reader manufacturers is relatively limited, with e-Image and ST supplying the majority of the current customer base nationally. (SFF 11; PMF 104.)

### II. E-IMAGE AND ST IMAGING'S PRODUCTS.

Historically, microform readers were analog, often bulky, standalone machines that were generally not connected to a printer or computer, making it impossible to print or save images. Also, these analog machines required numerous lenses so users could view microforms of various reduction ratios. (PMF 24.) Commonly used lens magnifications started at 7x and ranged up to 105x for ultrafiche, which is a type of microform where the image has been reduced a second time and can be as small as 1/105 of its original size. (PMF 24.)

---

[1] "SFF __" refers to paragraph(s) in the Joint Statement of Stipulated Facts, Dkt. 68.
[2] "PMF __" refers to paragraph(s) in e-Image's Statement of Proposed Material Facts, filed concurrently herewith.

In 2006, e-Image developed a new scanner, its ScanPro 1000, that was both compact and configured to provide a broad magnification range without the need for multiple lenses. (SFF 1.) e-Image has since improved upon the ScanPro 1000 and introduced the ScanPro 2000, ScanPro 3000, and ScanPro i9300 to the market. (SFF 2.)

In 2010, ST Imaging developed its ViewScan I to compete directly with e-Image. (SFF 3.) ST Imaging has since introduced additional ViewScan products. For the relevant period—2010 to the present—ST Imaging manufactured and sold three major iterations of the ViewScan: the original model or ViewScan I, the ViewScan II, and the ViewScan III. (SFF 3–5.)

## III.  ST IMAGING USES LITERALLY FALSE STATEMENTS TO UNFAIRLY COMPETE.

### A.  ST Imaging Misrepresented The Optical Magnification Of Its ViewScans.

ST Imaging falsely inflated the optical magnification capabilities of all three ViewScans. Specifically, ST Imaging advertised that its products possessed a larger optical magnification range than the systems were capable of achieving.

Optical magnification enlarges an image using only the physical lens system. (PMF 8.) Optical magnification is different from digital magnification. (*See* PMF 9–11.) Digital magnification uses software to enlarge a smaller section of an image that has already been captured by the physical lens system. (PMF 10.) While optical magnification physically moves the lens closer to the image, digital magnification takes the pixels captured by a lens and uses software to enlarge the image. (PMF 10.) An example of digital magnification is the pinching motion used to enlarge an image on a smartphone or tablet. The optical magnification of a camera system is important because generally optical magnification is sharper and shows more detail than an image magnified by digital zoom. (PMF 11.) Both ST Imaging and e-Image witnesses have testified that optical magnification is superior to digital magnification. (PMF 12.)

ST Imaging is aware of the actual optical magnification range of its products.  In response to an interrogatory seeking information about magnification, ST Imaging responded that with respect to its standard units, "[t]he equivalent magnification is approximately 7x to 21x for the ViewScan I, approximately 7x to 32x for the ViewScan II and III."  (PMF 22.)  Multiple ST Imaging witnesses provided similar testimony.  ST Imaging's Director of Imaging Products, Dan Donaldson, testified that ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████.  (PMF 17–19.)  ST Imaging consultant and engineer Phil Barboni similarly testified that ██████████████████████████████████████████████████████████████████.  (PMF 20.)  Additionally, Mr. Rennecker, in his role as ST Imaging's corporate representative, testified that without digital enhancement the optical magnification range of the ViewScan II was "in the 32x range" and that was a larger range than the ViewScan I.  (PMF  135.)

e-Image's technical expert Dr. Jon Ellis agreed.  When Dr. Ellis tested the ViewScan products, he concluded ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████.  (PMF 21.)  Dr. Ellis also tested ViewScan II and ViewScan III and determined that ████████████████████████████████████████████████.  (PMF 21.)

Nevertheless, from approximately April 2010 to June 2013, ST Imaging's marketing materials claimed that the ViewScan I was capable of 7x to 54x optical zoom.  (PMF 1.)  From approximately June 2013 to August 2014, ST Imaging's marketing materials claimed that the ViewScan II was capable of 7x to 105x optical zoom.  (PMF 2.)  And from approximately June 2014 until at least as recently as a few months ago, ST Imaging's marketing materials claimed that the ViewScan III was capable of 7x to 105x optical zoom.  (PMF 3.)  Examples of these marketing

materials include ST Imaging's brochures, which ST Imaging posted on its website and distributed to potential customers.  Below are three excerpts:



ViewScan I Brochure
(SFF 15.)



| ViewScan II Brochure | ViewScan III Brochure |
| (PMF 4.) | (SFF 19.) |

Late in the discovery period, and after the original product inspection, ST Imaging disclosed that it made a handful of sales purportedly using a separate lens that could replace the existing lens in the ViewScan I so a user could view ultrafiche.  This additional lens was provided for inspection, but when in the machine, it was ███████████████████████████████ ███████████████████████████████████████.  (PMF 25.)  When e-Image's expert, Dr. Ellis, inspected a ViewScan I with the ultrafiche lens, he concluded that it was ███████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.  (PMF 26.) Assuming that this single magnification was 105x as ST Imaging claims, Dr. Ellis concluded that even including the ultrafiche lens, the optical zoom capability of the ██████████████████████

███████████████████████.  (PMF 27.)  In other words, the ViewScan I was █████████

████████████████████████████████.  (PMF 27.)

The ViewScan II allegedly used the same fixed magnification ultrafiche lens as the ViewScan I.  (PMF 136.)  ST Imaging, however, did not produce a ViewScan II for inspection with an ultrafiche lens, but instead admitted it would have the same range as the ViewScan I.  ST Imaging did not sell the ViewScan III with an ultrafiche lens.  (PMF 137.)

## B.  ST Imaging Misrepresented The Megapixel Capabilities Of Its ViewScans.

ST Imaging also made literally false statements about the megapixel capabilities of the cameras in its ViewScan II and ViewScan III.  Digital cameras include an image sensor, which is the digital equivalent of film.  (PMF 29.)  Just as traditional cameras use film to capture light from an object to form an image, digital cameras use image sensors to capture light from an object and convert that light into a digital signal to form an image.  (PMF 29.)  The light captured by the image sensor is called optical data.  (PMF 29.)  An image sensor captures light using tiny light sensitive squares called pixels.  (PMF 30.)  A megapixel is one million pixels.  (PMF 30.)

ST Imaging's ViewScan II uses a camera having a 5 megapixel image sensor.  (SFF 7.)  ST Imaging  admitted  ████████████████████████████████████████████████████

██████████████████████████.  (PMF 49.)  ST Imaging's corporate representative and ST Imaging's engineer both testified that ████████████████████████████████████████████████████████.  (PMF 46.)  Nevertheless, ST Imaging represented that the ViewScan II has a 30 megapixel camera and that it produces a maximum image size of 80 megapixels.  (PMF 31, 32.)

ViewScan III uses a camera having a 14 megapixel image sensor.  (SFF 8.)  ST Imaging admitted that the ████████████████████████████████████████████████████████████

███████████.  (PMF 55.)  ST Imaging's corporate representative and engineer again admitted that ████████████████████████████████████████████████████████████████.  (PMF 46, 47.)

Nevertheless, ST Imaging represented that the ViewScan III has a 56 megapixel camera that produces a maximum image size of 80 megapixels. (PMF 32.)

Additionally, ST Imaging was deliberate and intentional in how it marketed its camera. Here is what Mr. Donaldson said about marketing ST Imaging's camera:

████████████████████████████████████████████.

(PMF 36 (emphasis added).)

**C.      ST Imaging Misrepresented the Safety Certifications Of Its ViewScans.**

Underwriters Laboratories (UL) is an independent, not-for-profit entity that establishes standards of safe product performance. *Underwriters Labs., Inc. v. Innovative Indus. of Tampa, Inc.*, No. 99 C 6485, 2000 WL 631304, at *1 (N.D. Ill. May 16, 2000). The safety standards are developed by UL after substantial consultation with industry representatives, and professional technical committees. A manufacturer cannot self-certify its device as UL certified. *See ECOS Elecs. Corp. v. Underwriters Labs.*, 743 F.2d 498, 500 (7th Cir. 1984); *see also* (PMF 60.) Instead, a manufacturer must have its products tested by UL's engineers. *Underwriters Labs.*, 2000 WL 631304, at *1. Products that meet UL's standards are listed by UL and may carry a UL designation. (SFF 31.)

ST Imaging's witnesses, including the designer of the ViewScan, testified that the ViewScan I and ViewScan II never received UL certification. (PMF 65; SFF 27, 28.) Undisputed evidences proves the ViewScan III was not UL certified until December 14, 2015. (SFF 29.)

Nevertheless, since 2010, ST Imaging represented in its marketing materials that its ViewScan devices had UL certification. (PMF 61–64.) For example, ST Imaging's brochures included the familiar UL logo and listed "cUL" under the heading "Safety and Approval." (PMF 61–63.) Below is an excerpt from one of ST Imaging's brochures that depicts the UL logo:



(SFF 15.)

The evidence suggests that ST Imaging's false claims about UL certification may have been motived by customers, such as government purchasers, who require UL certification for products that they purchase through government bids. To sell to government agencies and government owned libraries, vendors must contract with the Government Services Administration (GSA), which provides acquisition services to government organizations and the military. (PMF 72; SFF 14.) e-Image has a GSA contract. (PMF 74.) Using this GSA contract, e-Image both responds directly to government bids under its contract and lists the ScanPro scanners on government procurement websites, which likewise requires a GSA contract. (PMF 74.) There are many additional requirements for a product like the ScanPro to qualify for a GSA contract, and e-Image has invested a significant amount of time and money ensuring the ScanPro meets or exceeds these requirements.

All of ST Imaging's ViewScan products were listed as approved products by the GSA until August 8, 2015, when they were removed from the list at the request of the GSA for failing to comply with the GSA's requirements that all devices have UL certification. (PMF 75, 76.) ST Imaging's ViewScan III was again permitted to bid on GSA contracts sometime after December 14, 2015, when the ViewScan III finally received UL certification. (PMF 78.)

**D.**     **ST Imaging has made unsubstantiated product claims.**

ST Imaging has repeatedly represented to customers that its ViewScan products meet or exceed the specifications of the ScanPro, including specifications about magnification ranges up to 105x, megapixel capabilities beyond the ViewScan's capability. For example, ████████

█████████████████████████████████████████████████

████████████████████████████████████████. (PFF

##99–101.) ██████████████████████████████████

███████████████████



▎PMF 100.)

ST Imaging has no evidence to substantiate these claims.

## IV. ST IMAGING MADE FALSE STATEMENTS TO CUSTOMERS IN ADVERTISEMENTS AND MARKETING MATERIALS USED ACROSS THE COUNTRY.

ST Imaging created numerous marketing materials that contain literally false statements to advertise the features of its ViewScan products to potential customers. ST Imaging provided product literature in the form of product brochures, specification sheets, comparison charts, website content, and product summaries. (PMF 83.) ST Imaging created multiple iterations of brochures for each of its ViewScan products, as well as charts that offer a side-by-side comparison of the features of its ViewScan devices and e-Image's ScanPro devices. (PMF 84, 85.)

ST Imaging provided marketing materials containing the false statements to customers. (PMF 86.) ST Imaging provided the false statements directly to customers when ST Imaging participated in trade organization events such as the American Library Association's annual conference, through online advertising, and through direct marketing. (PMF 86, 88.) Additionally,

ST Imaging gave brochures, specification sheets, comparison charts, and product summaries to its nationwide network of third party resellers with instructions to distribute the materials to customers and prospective customers.  (PMF 138.)  In many cases, ███████████████████ ███████████████████████████████████████████████, which itself confirms the relevance of the false statements to the market and furthered the dissemination of literally false statements.  (PMF 91–93, 96.)

For the reasons that follow, e-Image is entitled to partial summary judgment as to ST Imaging's misrepresentations involving its products' optical zoom, camera resolution, and safety certifications as literally false statements.

## ARGUMENT

I. **E-IMAGE IS ENTITLED TO SUMMARY JUDGMENT THAT ST IMAGING VIOLATED THE LANHAM ACT.**

A. **Summary judgment is appropriate when literal false statements are made.**

e-Image prevails on its false advertising claim under Section 43(a) of the Lanham Act if it proves that ST Imaging: "(1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff."  *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999).  The false statement required to show a Lanham Act violation generally falls into one of two categories: statements that are literally false, and statements that, while literally true, are misleading in context, as shown by actual consumer confusion.  *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1088–89 (7th Cir. 1994).

When literal falsehood is demonstrated by measurable facts not in dispute, partial summary judgment is appropriate.  Courts routinely grant summary judgment on Lanham Act claims based

on literal falsity.  *See, e.g., Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1032 (N.D. Ill. 2013); *ITEX Corp. v. Glob. Links Corp.*, 90 F. Supp. 3d 1158, 1162 (D. Nev. 2015); *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, No. CIV.09-642-SLR, 2010 WL 1992247, at *4 (D. Del. May 18, 2010).  Courts in the Seventh Circuit have also found statements to be literally false on summary judgment, even if the court was unable to grant summary judgment on the entire Lanham Act claim.  *See, e.g., Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 976 (W.D. Wis. 2010); *GSI Grp., Inc. v. Sukup Mfg. Co.*, No. 05-3011, 2008 WL 4826265, at *5 (C.D. Ill. Oct. 28, 2008).

In *Dyson*, the court granted summary judgment because the defendant's literally false statements violated the Lanham Act based on the objective facts.  951 F. Supp. 2d at 1033.  The defendant, a vacuum manufacturer, advertised that its vacuum filter trapped over 99.9% of allergens.  *Id.* at 1031.  The plaintiff's expert testimony, however, showed that the defendant's vacuum filter did not trap that percentage of allergens when the vacuum was operated under its standard operating conditions.  *Id.*  The court rejected the defendant's argument that the filter could trap 99.9% of allergens when operated at a lower air flow condition than the vacuum's standard condition.  *Id.*  The court reasoned that consumers would understand the advertisement to refer to the standard vacuum conditions because defendant sold vacuums, not filters.  *Id.*  The court found that the undisputed facts satisfied the remaining Lanham Act elements and granted summary judgment in the plaintiff's favor.  *Id.* at 1032–34.

For the reasons that follow, there is no genuine issue of material fact that ST Imaging's representations at issue in this motion were literally false.

## B. When Evaluated In Context, ST Imaging's Statements Are Held Out As Fact Based.

When evaluated in context, ST Imaging's statements are explicit, factual product claims. In evaluating "whether a particular representation is literally false, it must be analyzed with its full context." *Scranton Gillette Commc'ns, Inc. Dannhausen*, No. 96 C 8353, 1999 WL 558134, at *1 (N.D. Ill. July 27, 1999); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (explaining court "must consider the advertisement in its entirety" and not "disputatious dissection").

Here, ST Imaging makes all of its literally false statements couched in the context of factual product features. (PMF 80.) The statements often appear separate from marketing paragraphs. (PMF 80.) The statements are on their own page, often the last page of ST Imaging's brochures, under headings such as "ST ViewScan III Scanner Specifications" or "ST ViewScan Microfilm Scanner Specifications." (PMF 81.) The statements about magnification, megapixels, and UL certification appear next to other fact based claims such as the dimension and weight of the machine, giving the consumer the impression that the statements are established product specifications, not puffery or mere marketing text. (PMF 82.)

## C. The Undisputed Record Proves ST Imaging's Statements Are Literally False.

While e-Image as the plaintiff bears the burden of proving literal falsity, the proof necessary to meet this burden varies based upon the type of statement made. *BASF*, 41 F.3d at 1091. "If the challenged advertisement makes implicit or explicit reference to tests [i.e., is an establishment claim], the plaintiff may satisfy its burden by showing that those tests do not prove the proposition; otherwise, the plaintiff must offer affirmative proof that the advertisement is false." *Id.* Thus, e-Image may prove literal falsity in either of two independent ways: (1) by showing that ST Imaging made establishment claims for which ST Imaging has no appropriate

substantiation; or (2) alternatively, if ST Imaging's statements are not establishment claims, e-Image can still prevail by demonstrating through its own testing that those claims are false. e-Image has met its burden under both of these tests.

1. **ST Imaging's statements are implied establishment claims that ST Imaging lacks testing to substantiate.**

ST Imaging's claims regarding magnification, megapixels, and UL certification are establishment claims. An establishment claim makes implicit or explicit reference to tests. *See BASF*, 41 F.3d at 1090–91. Implicit establishment claims do not use the words "tests" or "studies," but still necessarily communicate that they are based on testing. *Id.*; *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 272 (D. Del. 2010) (finding "implied establishment claim" because defendant's use of bar graphs signaled numeric values derived from some manner of product testing).

ST Imaging's statements are implied establishment claims because they all imply a level of testing or measurement to determine the advertised data. ST Imaging's representation that the ViewScans had UL certification is a perfect example of an implied establishment claim. UL is a global independent safety science company offering certification, validation, testing, inspection, and advising services for a variety of industries. *See Underwriters Labs.*, 2000 WL 631304 at *1. UL has been testing products and authorizing the use of its UL Certification Mark on products that conform to UL's Standards for Safety since at least 1937. Manufacturers seek UL certification and listing in the UL certification directory by submitting product samples to UL for evaluation and/or testing. *Id.* By telling customers that the ViewScan is UL certified, ST Imaging is making the claim that its ViewScan products completed the testing and evaluation necessary to conform to UL's standards. (PMF 128.) This claim requires UL testing to have occurred. *Id.* at *1.

Courts have regularly held that it is actionable as counterfeiting and unfair competition to use the UL mark without first completing the required tests and authorization process.  *See UL LLC v. Space Chariot Inc.*, ___ F. Supp. 3d ___, 2017 WL 1423706 (C.D. Cal. April 20, 2017) (awarding UL $1,000,000 in statutory damages for unauthorized use of UL mark); *Underwriters Labs.*, 2000 WL 631304 at *3. ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. (PMF 70.)

Likewise, ST Imaging's statements regarding magnification and megapixels are implied establishment claims because the numerical representations necessarily imply that there was some independent test or measurement taken to determine those numbers.  Specifications, by their very nature, are only meaningful if they have been confirmed by testing.  *See, e.g. BASF Corp.,* 41 F.3d at 1091.  When evaluating a claim that an antifreeze met the Ford and GM specification, the Seventh Circuit held that the term "meeting specifications" meant that "all requisite tests were performed and passed."  *Id*.  Because the defendant in that case "did not perform the tests, its claim was literally false."  *Id*.  Thus, it is implicit in any published specification that some form of reasonable and reliable testing was conducted to verify those specifications.

Here, ST Imaging has regularly represented its magnification and camera megapixel capabilities to be formal specifications.  For example, in response to a request for quotation from

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████. (PMF 99.)  ████████████

████████████████████████████████████████████████████████████

███████████████████████████████  (PMF 100.)  In response to other bids, ████████████

(PMF 101.) Because ST Imaging had no testing or accurate measurement that supported its magnification or megapixel claims at the time it made the claims, such "meet specifications" claims are literally false establishment claims.

Representations of product equivalence, when unsupported, are also actionable as literally false establishment claims. *Genderm Corp. v. Biozone Labs.*, No. 92 C 2533, 1992 WL 220638, *2, *14 (N.D. Ill. Sept. 3, 1992) (holding claim that one drug was the equivalent of another was literally false and explaining "where Defendant lacked clinical proof of its representations, its predictions regarding any particular results from use of its products are false and deceptive"). ST Imaging has regularly represented to customers that its ViewScan products exceed all specifications of e-Image's ScanPro products. (PMF 102.) For example, below is language drafted by Mr. Donaldson in response to a customer request for proposal that included e-Image ScanPro specifications in the bid requirements; this language is then followed by responses to specific requested specifications:

> Bidder is pleased to provide an even newer system than our competitors, not just in the resolution of the camera over its previous model, but in every aspect of hardware and software. Our ViewScan II system meets or far exceeds all of the important or salient requirements in this bid document. It is understood that most if not all of the requirements were taken word for word from one specific manufacturer's product brochure or specification document for the ScanPro 3000. We believe your intent is to also allow fair competition. We thank you in advance for your consideration of our newer product that in virtually all important aspects meet or exceed the bid requirements, and in many other ways will far exceed your expectations. We can deliver this new product as early as June 2013.
>
> **Microfilm Scanner Specifications**

(PMF 102.)

The Lanham Act requires ST Imaging to have substantiation for fact based comparisons. Because ST Imaging has no testing to support this claim, the statement is literally false.

What is worse, instead of testing to support its claim, ST Imaging had affirmative evidence that its claims were wrong. With respect to ST Imaging's optical magnification claims,

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ . (PMF 20.) Thus, ████████████████████████████████████

████████████████ . ST Imaging has come forward with no test results to substantiate the UL certification or optical magnification it advertised. Likewise, ST Imaging has come forward with no recognized method for substantiating its megapixel claims. Because ST Imaging simply does not have testing that was done at the time it made its establishment claims, e-Image is entitled to summary judgment.

> **2.     Undisputed evidence proves ST Imaging's statements are false.**

e-Image can also prevail by establishing through its own evidence that ST Imaging's statements are literally false. A statement is deemed literally false if it is a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000). Or, as the Seventh Circuit explained, a literally false statement is a "patently false statement that means what it says to any linguistically competent person." *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.,* 586 F.3d 500, 513 (7th Cir. 2009).

For example, a pharmaceutical ad that featured images such as two similar gasoline pumps or airline tickets with dramatically different prices and the slogan "Which one would you choose" was literally false because the ads provided the implied false message that the two drugs could be indiscriminately substituted, which amounted to a representation that the defendant's drug had properties of the plaintiff's drug that it actually did not have. *Rhone-Poulenc Rorer Pharm., Inc. v Marion Merrell Dow, Inc.*, 93 F.3d 511, 514 (8th Cir. 1996). Here, the overwhelming evidence proves ST Imaging's statements to be false.

(a)     **ST Imaging's magnification claims are literally false.**

ST Imaging's claims regarding the optical magnification are literally false because it has advertised a magnification range that is mathematically impossible given the function of the current lens in the system.  Dr. Ellis, e-Image's expert, calculated that the maximum optical magnification for the standard lenses on the ViewScan I, II, and III were ███████████ respectively.  (PMF 21.)

Again, ST Imaging's admissions affirm Dr. Ellis's conclusions.  ST Imaging admitted in discovery responses that its optical magnification ranges are "approximately 7x to 21x for the ViewScan I, [and] approximately 7x to 32x for the ViewScan II and III," which are not the ranges provided in ST Imaging's marketing materials.  (PMF 22.)  Likewise, multiple ███████ ██████████████████████████████████████████████████████████████████████. Mr. Donaldson, the designer of the ViewScan, testified that ████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████.  (PMF 17–19.)  ST Imaging's director and engineer, Mr. Barboni, ███████ ████████████████████████████████████████████████.  (PMF 20.)

As a possible counter, ST Imaging may attempt to rely upon a late disclosed ultrafiche lens, which apparently was not front of mind when any of ST Imaging's witnesses testified about magnification.  Assuming this lens was sold to customers as it was disclosed for inspection, ST Imaging's statements about its optical zoom capabilities are still literally false.  ST Imaging's ultrafiche lens ████████████████████████████████████████.  (PMF 27, 28.) e-Image's expert, Dr. Ellis, inspected and tested a ViewScan I with the ultrafiche lens and found ███████████████████████████████████████████████████████████████. (PMF 25, 26.)  Assuming this is 105x as ST Imaging advertised, its claim that the ViewScan I has 7x to 54x optical zoom is literally false because, ████████████████████████████████

█████████████████████████████████████████████████. (PMF 27.)  In other words, the ViewScan I ██████████████████████████████████████████. (PMF 27.)

The ViewScan II allegedly used the same fixed magnification ultrafiche lens as the ViewScan I, and would thus suffer from the same problem.  (PMF 28.)  Because the ultrafiche lens ████████████████████████████████████████████████████████ ███████████████████████. (PMF 28.)  In other words, the ViewScan II ████████████ █████████████████████████████████. (PMF 28.)  The ViewScan III does not have an ultrafiche lens available, so ST Imaging's claims that the ViewScan III possessed 7x to 105x optical zoom are literally false in any event.  (PMF 137.)

**(b)**  **ST Imaging's camera claims are literally false.**

ST Imaging made specific claims about the camera capabilities of its ViewScan products. The number of megapixels captured by a camera system is an objective fact that can be proven or disproven.  (PMF 139.)  ST Imaging's claims relating to the megapixel capabilities of the ViewScan II and ViewScan III are literally false.

It is undisputed that ST Imaging's ViewScan II has a 5 megapixel image sensor and ST Imaging's ViewScan III has a 14 megapixel image sensor.  (SFF 7, 8.)  In attempting to justify how ST Imaging could tell customers that it had a 30, 56, or 80 megapixel camera, ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. (PMF 42.)  In reality, the ViewScan devices do no such thing.

ST Imaging's corporate representative ██████████████████████████████ ████████████████████████████████████████████████. (PMF 49.) The ViewScan II employs a process ████████████████████████ ███████████████████████████████. (PMF 51.)  The camera then ██████████████

███████████████████████████████████████████████████████████. (PMF 52.) ██████████████

███████████████████████████████████████████████████. (PMF 53.) ████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ (PMF 54.) ████████████████████

████████████████████████████████████████████. (PMF 53.) Accordingly, the ViewScan

II ███████████████████████████████████████████████. (PMF 45, 46.) Nor does it

have a ████████████████████████████████████████. (PMF 45.)

ST Imaging's corporate representative also confirmed that ██████████████████████

████████████████████████████████████████████████████████████████████████████████

████ (SFF 8; PMF 55.) The ViewScan III employs a process similar to the ViewScan II, but

████████████████████████████████████████████████████████████████████████████████

████████. (PMF 56.) As with the Viewscan II, the ViewScan III ████████████████████

███████████████████████████████████████████ (PMF 57.) ████████████████████

██████████████████████████████████████ (PMF 58.) Again, the process ████████████████

████████████████████████████████████████████████████████████████. (PMF

58, 59.) Accordingly, the ViewScan III ████████████████████████████████████████

███████████████████████████, as advertised by ST Imaging.

ST Imaging's corporate designee ████████████████████████████████████████████

███████████████████████████. (PMF 46.) ST Imaging further admitted that ████████████

██████████████████████████████████. (PMF 47.) And ST Imaging's engineer admitted that, ████

████████████████████████████████████████████████████████████████████████████████

████████████████████████. (PMF 48.)

In fact, when ST Imaging did <u>not</u> include references misrepresenting its camera system capabilities in marketing materials, ST Imaging's resellers protested:

> Your new brochure for the ViewScan III has a HUGE omission. No where in the brochure do you state the maximum megapixel image. I ultimately will win the ScanPro protest at Yorktown because you have the maximum megapixel image. Without that, I would have lost the protest! . . . PLEASE put the maximum megapixel image on this brochure!!!!!!

(PMF 43.)

Per reseller demand, that's exactly what ST Imaging did on its brochure for the ViewScan III. (PMF 44.) This email exchange shows exactly why ST Imaging chose to misrepresent its products: because ST Imaging's sales channel told ST Imaging they needed those statements to generate revenue. (PMF 44.)

### (c)   ST Imaging's Claims of UL Certification Were Literally False.

It is undisputed that ST Imaging's ViewScan III was not UL certified until December 14, 2015. (SFF 29.) It is also undisputed that the ViewScan I or ViewScan II never obtained UL certification. (SFF 27, 28.) Yet ST Imaging advertised its ViewScan products as being UL certified as early as 2010. (PMF 64.) For example, a ViewScan I brochure created in 2010 represented that the ViewScan I was UL certified by applying the UL logo. (SFF 15.) As another example, in a ViewScan II brochure dated March 3, 2014, ST Imaging continued to represent that the ViewScan II was UL certified by listing "cUL" under the heading "Safety and Approval." (PMF 62.) ST Imaging made the same false claim in its ViewScan III brochures created before December 14, 2015. (PMF 63.)

### D.   ST Imaging's False Statements Were In Commercial Advertising.

ST Imaging's literally false statements were "commercial advertising or promotion" under the Lanham Act. The Seventh Circuit has explained that, under the Lanham Act, "commercial advertising or promotion" is not limited to published broadcast materials or a classic advertising

campaign.  *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 521 (7th Cir. 2012).  Instead, commercial advertising or promotion is "some medium or means through which the defendant disseminated information to a particular class of consumers."  *Id.* at 522.  Whether a defendant's specific medium is commercial advertising varies according to the specifics of the industry.  *Id*.

In *Neuros*, the Seventh Circuit reversed the district court's finding that the defendant's false representations were not in commercial advertising.  *Id*.  The defendant marketed its high-speed blowers for wastewater treatment plants by visiting engineering companies and presenting them with promotional materials.  *Id*.  The defendant also posted its marketing materials on its website.  *Id*.  The Seventh Circuit rejected the district court's contention that commercial advertising must reach the general public.  *Id*.  Because the general public does not buy high-speed blowers, there was no basis for limiting the Lanham Act advertising to the general public.  *Id*.

Here, ST Imaging used its reseller network to visit libraries across the country to perform demonstrations of its product and distribute marketing materials.  (PMF 89.)  Additionally, ST Imaging's false statements appear in its brochures and marketing materials that were distributed to potential customers at trade shows, and provided across the country to potential customers with ST Imaging proposals.  (PMF 79.)  ST Imaging additionally posted its brochures and other marketing materials on its website (PMF 83), which courts have found to satisfy this element.  *See Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 831 (N.D. Ill. 2000) ("The website is a form of commercial advertising or promotion"); *Neuros*, 698 F.3d at 521.

ST Imaging was further able to disseminate its marketing materials to the relevant purchasing class because it included its marketing materials with its responses to bid solicitations by entities seeking microfilm readers.  (PMF 90); *see Tao of Sys. Integration, Inc. v. Analytical*

*Serv. & Materials, Inc.*, 299 F. Supp. 2d 565 (E.D. Va. 2004) (holding that a single proposal to a single customer could constitute "advertising" or "promotion" under the Lanham Act).

As in *Neuros*, it is immaterial whether ST Imaging's marketing materials reached the general public. ST Imaging disseminated its marketing materials to a significant portion of the relevant class of potential customers, those who still own and require machines to scan and read microform. (PMF 86, 90.) Accordingly, ST Imaging's literally false statements appeared in commercial advertising or promotion under the Lanham Act.

### E. ST Imaging's False Statements Were In Interstate Commerce.

It is undisputed that ST Imaging sold ViewScans in interstate commerce. (SFF 33.) ST Imaging manufactures its ViewScan products in the Chicago, Illinois area. (SFF 34.) ST Imaging has sold products across the country. (SFF 35.)

It is also undisputed that ST Imaging's literally false statements were disseminated in interstate commerce. ST Imaging circulated its brochures and marketing materials nationwide using its network of national resellers. (PMF 138.) ST Imaging provided its brochures and marketing materials at national tradeshows. (PMF 88.) And ST Imaging posted its brochures on its website. (PMF 79.) ST Imaging additionally e-mailed its brochures to prospective customers across the country, which has been found to constitute interstate commerce. *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) (holding that email uses interstate communications network); *see also Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 803 (6th Cir. 2015) ("very act of sending an e-mail creates the interstate commerce").

### F. Consumer Deception, Materiality, and Injury Are Presumed.

Where, as here, the challenged statements are literally false, e-Image is not required to "show that the statement either actually deceived consumers or was likely to do so," because the literally false statement is presumed to have done so. *B. Sanfield, Inc.*, 168 F.3d at 971. In other

words, if a statement is literally false, "the plaintiff need not show that the statement either actually deceived customers or was likely to do so." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999); *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir. 1992) (affirming finding of literal falsity and rejecting appellant's argument that actual deception must be shown).

As to why ST Imaging's literally false statements do not require proof that customers were actually deceived:

> What the cases mean when they say that proof of literal falsity allows the plaintiff to dispense with evidence that anyone was misled or likely to be misled is that the seller who places an indisputably false statement in his advertising or labeling probably did so for a malign purpose, namely to sell his product by lies, and if the statement is false probably at least some people were misled, and since it was a lie why waste time on costly consumer surveys?

*Schering-Plough v. Schwarz Pharma,* 586 F.3d at 512. Here, upon a finding of literal falsity, e-Image is entitled to a finding that consumers were deceived by the literally false statements in violation of the Lanham Act. *Avila v. Rubin*, 84 F.3d 222, 227 (7th Cir. 1996) ("The general rule is that if a statement is literally false, the court may grant relief without reference to the reaction of buyers or consumers of the product").

## II.  ST IMAGING'S MISREPRESENTATIONS MISLED CUSTOMERS.

e-Image only moved for partial summary judgment on selected ST Imaging misrepresentations because they are literally false. Other statements will require a trier of fact and are not appropriate for summary judgment. However, the undisputed factual record proves that ST Imaging's literally false statements misled customers into purchasing ST Imaging's ViewScans.

### A.  ST Imaging's Misrepresentations Deceived Customers.

Actual deception and resulting customer reliance can be proven not only by direct evidence of actual diversion of sales to the defendant, but also by customer surveys or by testimony of a

dealer, distributor, or customer.  *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206–07 (7th Cir. 1982).   Here,  the  testimony  from  ST  Imaging's  ████████████████████████████████ ████████████████████████████████.  Ms.  Currier,  an  ST  Imaging  reseller,  testified  ████ ████████████████████████████████.  (PMF 91.)  Mr. Dring, another ST Imaging reseller, testified that he believed ST Imaging's claim that ST Imaging's optical magnfication is 105x.  (PMF 91.)  Mr. Sandlass, another ST Imaging reseller, understood that the ViewScan had an optical zoom range of 7x to 54x.  (PMF 91.)

Mr.  Donaldson  testified  ████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████.  (PMF 140.)  He further testified that it ████████████████████████████
████████████████████████████████████████████████████████████████████.
(PMF 141.)  Of course, ST Imaging's own engineer, Mr. Barboni, testified it████████████████
████████████████████████████████████  (PMF 129.)  Not surprisingly,
████████████████████████████████████████████████████████████████████
████████████████████████████████████████.  (PMF 96.)  It does not appear Mr. Barboni ever talked with ST Imaging's resellers on these issues.

Here, there is no dispute that ST Imaging's misinformation improved its bottom line.  For example,  ████████████████████████████████████████████████████████████
████████████████████████  (PMF 99.)  ████████████████████████████████████
████████████████████████████████████████.  (PMF 100.)  ████████████
████████████████████████████████  (PMF 100.)  Ms. Currier won the sale.

ST  Imaging's  resellers  were  also  deceived  regarding  the  megapixel  claims  and  UL certification.  ████████████████████████████████████████████████████████████

█████████████████ . (PMF 93.) ██████████████████████████████

██████ . (PMF 93.)  Regarding UL certification, Mr. Sandlass testified that he never questioned

whether the ViewScan devices were UL certified.  (PMF 92.)

ST Imaging's misrepresentations were material because they influenced purchasing

decisions of customers.  *Generac Power Sys., Inc. v. Kohler Co.*, No. 12-C-66, 2013 WL 238843,

at *1 (E.D. Wis. Jan. 22, 2013).  UL certification influenced all purchasing decisions made through

the GSA because the GSA requires that all electronic devices must be UL certified.  (PMF 73.)  So

without misrepresenting its UL certification, ST Imaging could not have sold any of its ViewScan

products through the GSA from 2010 to 2015.

ST Imaging's misrepresentations also influenced purchasing decisions in bid situations.



. (PMF 97.) █

(PMF 98.)

### B.    e-Image Has Been Harmed By ST Imaging's False Advertising.

A plaintiff seeking to assert a false advertising claim under § 1125(a) must allege "an injury

to a commercial interest in sales or business reputation proximately caused by the defendant's

misrepresentations."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390,

188 L. Ed. 2d 392 (2014).  "[A] defendant who 'seeks to promote his own interests by telling a

known falsehood to or about the plaintiff or his product' may be said to have proximately caused

the plaintiff's harm."  *Id*. at 1393–94 (citations omitted).

While there may be some minor disagreement as to total percentages, there is no dispute

e-Image and ST Imaging make up the overwhelming share of the national market for microform

equipment.  e-Image was demonstrably harmed by ST Imaging's false advertising by losing sales

to ST Imaging.  (PMF 104; *see also* SFF 11.)  e-Image lost numerous sales to ST Imaging where the parties were directly competing for the sale.  (PMF 105.)  e-Image additionally lost numerous bids to ST Imaging.  (PMF 105.)

During the time ST Imaging falsely advertised its products, e-Image lost over ███████ in revenue to ST Imaging.  (PMF 106.)  Many of these lost sales occurred in head-to-head bidding situations.  As just one example, in 2013, ███████████████████████████████ ████████████████████.  (PMF 107.) ███████████████████████████████ ████████████████████████████████████ (PMF 107.)  ST Imaging's reseller, Servicestar, responded to an RFQ by representing that the ViewScan II had "just ONE Optical zoom lens which is 7x-105x."  (PMF 108.) ███████████████████████ ██████████████████████████████████████████.  (PMF 98.)

## III.   ST IMAGING'S FALSE ADVERTISING WAS WILLFUL.

e-Image does not need to prove intent or willfulness to establish ST Imaging's liability under § 43 of the Lanham Act; however, a finding that ST Imaging acted knowingly and willfully supports an award of enhanced damages, disgorgement of profits, and attorneys' fees.  *See* 15 U.S.C. § 1117(a).   Under the Lanham Act, "willfulness requires a conscious awareness of wrongdoing by the defendant or at least conduct deemed objectively reckless measured against standards of reasonable behavior."  *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 191 (1st Cir. 2012).  Here, ST Imaging knew its statements were false but used them anyway.  Because a rational trier of fact could only find that ST Imaging's misconduct was done consciously by ST Imaging, or at the very least was objectively reckless, summary judgment is appropriate.

### A.   ST Imaging Knew Its Statements About Optical Zoom Were False.

ST Imaging knew that its products could not achieve 7x to 105x optical zoom.  According to one of ST Imaging's resellers, ████████████████████████████████████

█████████████████████████. (PMF 109.) ████████████████████████████

███████████████████████████████. (PMF 109.)

In its continued effort to promote its ViewScan devices as "bigger," ST Imaging's leadership chose not to correct its optical zoom misstatements even after ███████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████.
(PMF 110.) ████████████████████████████████████████

███████████ (PMF 111.) ███████████████████████████████████

███████████████████████████████████████. (PMF 112.)

Mr. Barboni ████████████████████████████████████████

███████████████████████████████ (PMF 111.) Mr. Barboni ████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████.
(PMF 113.) But ST Imaging had already admitted optical magnification is superior to digital zoom, ████████████████████████████ (PMF 12.)

Also, in September 2015, ███████████████████████████████████████████

████████████████████████████████ (PMF 114.) Mr. Rennecker admitted that he believed Mr. Barboni's conclusions about optical magnification to be accurate. (PMF 115.) Yet ST Imaging resellers continued to misrepresent the ViewScan's optical zoom, and generated revenue from those misrepresentations.

For example, well after ST Imaging knew its optical zoom representations were literally false, ST Imaging's resellers continued to misrepresent the ViewScan's optical magnification capabilities. As just one example, in 2016, an ST Imaging reseller ████████████████████████

(PMF 118.) ████

████

████

████ (PMF 118.)

Even knowing now that its statements are false, ST Imaging <u>still</u> has not informed its resellers that its products do not have 7x–105x optical magnification. (PMF 116.) ████

████

████ (PMF 119.) ████

████

████ (PMF 134.) The time has come to hold ST Imaging responsible for its decision to permit literally false statements about its products to persist in the marketplace for years after it knew such statements were literally false. As such, summary judgment is appropriate that ST Imaging's representations as to its optical zoom were willful.

**B.** **<u>ST Imaging Knew Its Statements About Camera Megapixel Capabilities Were False.</u>**

ST Imaging knew that the ViewScan II was only a 5 megapixel camera and the ViewScan III was only a 14 megapixel camera. In one instance, Mr. Donaldson ████

████

████ (PMF 120.) At the same time,

████

████

████. (PMF 121.)

For example, ████

████. (PMF 99.) ████

██████████████████████████████████████████████████████████████████████████. (PMF 99.) ████████████████████████████████████████████████████████████ (PMF 100.)

Another ST Imaging reseller misrepresented the ViewScan's ████████████████████████ ██████████████████████████████████████████████. (PMF 122.) ████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ███████ (PMF 123.)

███████████████████████████████████████████████████████████████. (PMF 129.) But its resellers claimed they did anyway. (PMF 38, 39.) So did ST Imaging's brochures. (PMF 31–34.) There is not a scintilla of evidence to support ST Imaging's products having anything other than a 5 or 14 megapixel camera system. Yet ST Imaging would regularly claim that it possessed a 30, 56 or 80 megapixel camera system when the customer required it so that ST Imaging could make the sale. (PMF 31–34.) This conduct was a conscious decision by ST Imaging. At the very least, ST Imaging had no valid justification to make the claim. No tests were performed to justify its camera claims. No industry standard justified making such a claim. Thus, as a matter of law, ST Imaging was objectively reckless in making the statements, and summary judgment that ST Imaging's actions were willful is appropriate.

**C.      ST Imaging Knew Its Statements About UL Certification Were False.**

Perhaps the most egregious instance of willful misconduct in the marketplace is how ST Imaging claimed it possessed safety certifications that it knew it did not. ST Imaging knew the ViewScan devices were not UL certified. (SFF 27–29.) ST Imaging never obtained UL certification for any of the ViewScan products until December 14, 2015. (SFF 27–29.) And even then, ST Imaging only obtained UL certification for the ViewScan III. (SFF 29.)

Having failed to submit any of its devices for UL certification, ST Imaging was fully aware that its devices were not UL certified. Yet since 2010, ST Imaging claimed it possessed UL certification for its products. (PMF 64.) ST Imaging knew many customers require UL certification for sales in the United States. (PMF 132.) And UL certification was mandatory to obtain a GSA contract to sell ST Imaging's products to the government. (PMF 73.)

ST Imaging's use of the UL mark when it had not submitted its products for testing can only be defined as a conscious awareness of wrongdoing as a matter of law. ST Imaging knew its UL certification representations were literally false. ST Imaging made the statements to obtain sales it otherwise could not, plain and simple. At the very least, such misconduct is objectively reckless. ST Imaging knew it needed certification to use the mark, and it did not follow the required procedures and testing to in fact use the UL mark. Thus, the Court should grant summary judgment finding ST Imaging's misconduct was willful.

## CONCLUSION

For the reasons set forth above, e-Image respectfully requests summary judgment on Count I of its Second Amended Complaint for the following issues:

- That ST Imaging's statements regarding the optical zoom capabilities of its ViewScan devices were literally false in violation of the Lanham Act;

- That ST Imaging's statements regarding the camera megapixel capabilities of its ViewScan II and ViewScan III devices were literally false in violation of the Lanham Act;

- That ST Imaging's statements regarding UL certification were literally false in violation of the Lanham Act; and

- That ST Imaging knowingly and willfully made the literally false statements.

Dated this 26th day of June, 2017.

Respectfully submitted,

_s/Johanna M. Wilbert_
David P. Muth
Johanna M. Wilbert
Michael T. Piery
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2350
Milwaukee, WI 53202-4497
414-277-5000

Matthew J. Duchemin
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
608-251-5000

_Attorneys for Plaintiff, e-ImageData Corp._